RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0178p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KEVIN KEITH,

        *Petitioner-Appellant*,

    *v.*

LEON HILL, Warden,

        *Respondent-Appellee*.

No. 21-3948

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Cleveland.
No. 1:18-cv-00634—Solomon Oliver, Jr., District Judge.

Argued:  April 26, 2023

Decided and Filed:  August 15, 2023

Before:  SILER, KETHLEDGE, and WHITE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  Rachel G. Troutman, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant.  Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Rachel G. Troutman, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, Justin E. Herdman, Calland M. Ferraro, JONES DAY, Cleveland, Ohio, James R. Wooley, HILOW & SPELLACY, Cleveland, Ohio, Zachary M. Swisher, SYBERT, RHOAD, LACKEY SWISHER, LLC, Powell, Ohio, for Appellant.  Michael J. Hendershot, Benjamin M. Flowers, Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

    KETHLEDGE, J., delivered the opinion of the court in which SILER, J., joined in full. WHITE, J. (pg. 18), delivered a separate opinion concurring in the judgment.

———————————

**OPINION**

———————————

KETHLEDGE, Circuit Judge.  In January 1994, the state of Ohio indicted Kevin Keith—along with his cousin and uncle—on cocaine-trafficking charges based on information provided by Rudel Chatman.  Less than a month later, someone shot six of Chatman's relatives, killing three of them.  A survivor identified Kevin Keith as his attacker, and an Ohio jury convicted Keith of triple homicide and sentenced him to death.

Keith has since filed four federal habeas petitions.  Three of those—including this one—argued that the prosecution failed to turn over exculpatory evidence before trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  The federal habeas statute bars consideration of these claims unless Keith can show that no reasonable juror today would convict him in light of the "evidence as a whole."  We agree with the district court that Keith cannot make that showing, and affirm.

I.

A.

In 1993 and 1994, Rudel Chatman served as a confidential informant for a police task force investigating drug trafficking in Ohio.  Chatman assisted with two important investigations.  The first, initiated by the State Pharmacy Board, concerned a pharmacy burglary ring orchestrated by brothers Bruce and Rodney Melton.  The second involved suspected cocaine trafficking by Kevin Keith and several of his friends and family, including Keith's uncle Gene Keith Sr. and his cousin Gene Keith Jr.

Chatman helped the task force gather critical information, but the Keiths soon became suspicious.  During one encounter in September 1993, Kevin Keith pinned Chatman against a wall so that Gene Jr. could pat him down for wires.  When they found none, Keith made off with Chatman's wallet and $700 in cash.  Two months later, another relative of Keith's approached Chatman's girlfriend's mother and asked "to go for a ride with her."  She later told police what happened when she got in the car:

> Gene Keith Sr. was in the car in the driver's seat and Don [Keith] got in the car and Gene drove off.  Gene Sr. told her that they didn't want anything to happen to her daughter or grandkids and she asked him what he meant by that.  Gene said that Rudel was a narc and was working for the cops . . . Gene said he just wanted her to know that if they got busted Rudel was history because the contract was already out on him.  Don Keith then told her that he could easily slip into town just like he did this night and no one would ever know it.

Despite these threats, Chatman continued his work for the police.  On January 21, 1994, task force officers arrested Keith and eight others on assorted drug charges.  Keith was released on bond shortly thereafter.

At around 8:45 p.m. on the evening of February 13, 1994, someone visited Chatman's sister Marichell.  Multiple family members were home that day: Marichell's daughter Marchae, her cousins Quinton and Quanita, and their aunt Linda.  Marichell's boyfriend Richard Warren was also there.  The visitor asked Marichell for a glass of water and spoke briefly to Linda.  Then, suddenly, he pulled a handgun from a trash bag, told everyone to "get on the floor," and began firing.  Marichell and Linda were killed instantly, and everyone else suffered multiple gunshot wounds.  Warren managed to escape the apartment and and run across a grassy area—the attacker shot him again in the buttocks as he ran—until Warren reached a nearby restaurant, where he described the attack and asked for help.  First responders rushed Warren, Quanita, Quinton, and Marchae to the hospital.  There, seven-year-old Marchae soon died of her injuries.

Meanwhile, at the crime-scene, Nancy Smathers—who lived down the street from the Chatmans—told investigating officers she had heard "popping noises" and seen a large, six-foot tall black man run to a car, drive into a snowbank, rock his car to release it from the snow, and drive away.  Smathers said that the car had been white, cream, or light yellow in color, with broken dome and license-plate lights.

A member of the task force thereafter warned local police that Keith had a motive to harm the Chatmans and that Keith's uncle Gene had "told someone that [the Keiths] were 'going to whack families' in retribution for their arrests."  In the hospital, Warren described his attacker as a "fat black guy, 6' to 6'2", weighing 250 to 275 [pounds]," and he picked Keith out of a six-photo lineup (albeit one that featured Keith's photo more prominently than the others).  Warren also said that Marichell told him the shooter had recently been involved in a "large drug bust"

and was called "Kevin." Keith's picture then appeared on the local news, and Smathers called the station to say that Keith was the person she had seen on the night of the murders. Police then arrested Keith.

After Keith's arrest, Damon Chatman—a surviving relative of Rudel's—told police that "he [had] heard the Keiths were going to 'kill every Chatman alive'" in retribution for the January arrests. The chief investigator on the case, Captain Corwin, then visited 4-year-old Quinton and 7-year-old Quanita in the hospital, where Quinton told him that "Kevin" had been the shooter. Quanita said that her "daddy's friend" Bruce had shot her. When Corwin showed Quanita the photo-lineup, Quanita pointed at Keith's picture and said that it looked like the man, but that it was not him. Quanita's father, Demetrious Reeves, was friends with Keith as well as Bruce Melton; and Quanita's mother, Joyce Reeves, told police that her daughter had mistakenly called Keith "Bruce" in the past.

A few weeks later, one of Marichell's neighbors, Kathy Gale, came forward to the police. Gale said she had not done so earlier because she was scared and lived "right next door to the scene." According to the police's notes of the interview, however, Gale remembered seeing Keith on the day of the murders:

> [O]n the day of the shooting approx. 3pm., she saw Kevin Keith, carrying a duffle bag, go to Marichell Chatman's apartment. She advised [that] her son Rodney and Richard Warren had been upstairs in the apt. playing Nintendo and didn't see him. After he left she advised Marichell came over and spoke to her and she asked her who the man was and Marichell told her it was Kevin Keith. And was saying his visit was funny as all he wanted was a glass of water, which she had given him.

Later that day, just minutes before the shooting, Gale said, she saw Linda Chatman arrive at the apartments to "pick up the Reeves kids to babysit them." Just "as she was leaving and Linda was going [inside], she saw Kevin Keith at the east end of the walk by the parking lot."

A short time later, Gale's son Jessey then saw Keith repeatedly shoot Warren as he tried to escape:

> She advised when Warren came out of the apt. after being shot he pounded on their door for help, then ran towards Ike's [restaurant] as Keith was shooting at him. Her son Jessey had went to the door to see what was going on. When he

opened the door, Keith was standing only approx. 6 feet away from him, firing at Warren, who was running. She advised Keith was concentrating on Warren and didn't see him. Jessey saw Warren get shot and fall in the snow. Keith leveled the gun at Warren and pulled the trigger but the gun didn't go off, at which time Keith turned and fled.

Less than a week after Gale's statement, Keith's case proceeded to trial.

## B.

On the first day of trial, Keith moved to exclude Richard Warren's identification testimony on the ground that police officers had improperly suggested the name "Kevin" to Warren. After a brief hearing, the court denied that request, and the parties proceeded with their proofs.

Warren testified that, on the day of the murders, someone came to his girlfriend Marichell Chatman's apartment while he was staying there. Warren said the intruder wore "a turtleneck shirt pulled up over the bottom part of his face" and had asked to speak to Linda Chatman. While Linda and the intruder stepped out of the apartment to talk, Marichell told Warren that the intruder's name was Kevin:

> A: Well, I was standing at the door and by that time Marichell was standing next to me and I asked her who this guy was and she told me his name was Kevin.
>
> Q: And did she mention the last name?
>
> A: She mentioned the last name. I didn't recall it.
>
> Q: What else did she say?
>
> A: She mentioned his name was Kevin and said his last name and that he was involved in a big drug bust. But she didn't say when or where.

Soon afterward, Warren said, the intruder returned, asked Marichell for a glass of water, and pulled out a gun:

> A: At first when he pulled it out and pointed it at me, I just sat there because I didn't know what to do. I was pretty scared. Then he said, "I ain't bullshitting, get over here." And at that time I came over there and he made us—"Get on the floor," he goes.
>
> …

Q:  After everyone was ordered to the floor then what happened?

A:  Then Marichell was saying, you know, "What are you doing?  Why are you doing this? We didn't have anything…?  She used his name.  She said, "You know, Kevin, we didn't do anything."  He told her, "Don't say my name. Don't say my name."  And then she said, "Well, you don't hurt us—you ain't going to hurt us while the children are here.  I don't want anything to happen to those children."

…

A:  . . . Then he put the gun to her head and told her to shut up.  There was just more conversation that went on and he said, "Well, you should have thought about this before your brother started ratting on people."

Warren then identified Keith as the gunman.

Smathers testified next.  On the stand, she repeated the substance of her statement to the police: namely, she had seen a large black man run to the parking lot and get into a cream-colored car with a broken dome light.  She also described how the man had tried to dislodge his car from the snow:

Q:  Obviously, you just mentioned somebody rocking the car.  Tell us in your own words what you actually observed after the car hit the snowbank.

A:  The car hit the snowbank and upon hitting the snowbank, you could tell it was stuck because the wheels were turning too fast because it was on ice.  And at that time they kept, like how you rock it back and forth when you are stuck. And like, upon that, they opened the door and he had his hand up on where the metal meets the frame and the hood, holding there and stepped out and with one foot, rocked back and forth, pulling at the same time.

Q:  You say this person had a hand on it?

A:  Yes, whatever it is that connects the roof of the car to the base of the car where the door shuts, that metal part right there.

Smathers pointed to Keith in the courtroom to identify the man she had seen.

Over the course of the next several witnesses, the prosecution established that Keith's girlfriend Melanie Davison had visited Keith in jail using a 1982 Oldsmobile Omega with the license plate MVR043.  A police officer testified he had impounded that vehicle, which belonged to Davison's grandfather, because of reports that the car at the crime scene had left a partial license plate print of "043" in the snow.  (In Ohio, vehicles have license plates on their front

bumper as well as in back.)  Testimony from the officer established that the Oldsmobile had broken dome and plate lights, like the car Smathers saw.  The prosecution further showed that someone had changed the Oldsmobile's tires shortly after the murders, even though Davison's grandfather testified he had put new tires on the vehicle not long before.  Meanwhile, the defense established that 17 vehicles registered in the vicinity of the crime scene had license plates that included "043."

A series of experts then testified, explaining that, in the days following the crime, they had tested fingerprints, fibers, DNA, blood, and other evidence from the scene, from the Oldsmobile, and from Keith's residence.  A fingerprint examiner said that, though she had found no usable prints on the Oldsmobile, she did find smudges consistent with Smathers's account:

> A: This is a photograph of that same vehicle.  This is the position between the front windshield and the driver's door.  And it shows where there are some smudges here from the hands and fingers or something on one of the posts.  This is the outside of the post.

Another forensic expert, Michele Yezzo, said she could confirm that the perpetrator's car had left a partial license plate imprint of the numbers "043" in the snow, which matched the placement and shape of the license plate on Davison's Oldsmobile.  Yezzo also testified that the tire tracks matched the tires Davison's grandfather had recently purchased for his Oldsmobile—though they did not match the tires actually installed on it when it was found.

The defense began its case by casting doubt on Warren's testimony.  Multiple witnesses confirmed that Warren had initially said the shooter was masked and unidentifiable, and Captain Stanley acknowledged that he had failed to record some of his conversations with Warren. Rodney Melton also testified, and admitted that he owned and drove a cream-colored car and had been at the scene when a crowd gathered after the murders.  Melton also said he had been asleep until "about 10:30, 11:00" that night—until his friends woke him up and told him "a bunch of people got shot at Marichell's apartment."  On cross-examination, Melton said it was "possible" that Marichell was his daughter.

The defense then presented Keith's alibi. Gene Keith Sr.'s wife, Gracie, testified that Keith had been at her home at the time of the shooting. And a neighbor of Keith's girlfriend Melanie Davison, namely Judith Rogers, testified that she had seen Keith and Davison leave Davison's apartment building in a blue vehicle around 8:45 p.m. that night. Quinton and Quanita's father, Demetrious Reeves, also testified that Bruce Melton was a good friend of his, and the defense played the tape of Quanita's interview for the jury. In the interview, Quanita identified "daddy's friend" Bruce as the killer.

On rebuttal, the prosecution sought to rehabilitate Richard Warren's testimony by establishing that he had given the name "Kevin" to several doctors and nurses before speaking with the police. Captain Stanley testified that he spoke to a "nurse Amy Gimmets," who told him that Warren had identified "Kevin" as his attacker. Another nurse, John Foor, testified that Warren had written "Kevin" on a notepad at 5 a.m. the morning after the shooting. Foor testified that he conveyed the name "Kevin" to the police and discarded the piece of paper. And Joyce Reeves, Quanita's mother, explained that Quanita had mistakenly called Kevin Keith "Bruce" in the past.

Bruce Melton testified last. He denied any involvement in the murders and said that he had been in Columbus, Ohio, on the night of the crime. The prosecution then confirmed Bruce's height and weight:

Q: How tall are you, sir?
A: Five nine.
Q: How much do you weigh?
A: 160.

After lengthy deliberations, the jury convicted Keith on all counts and sentenced him to death.

## C.

Keith appealed his conviction and sentence, but the Ohio Court of Appeals and Ohio Supreme Court affirmed. *State v. Keith*, No. 3-94-14, 1996 WL 156716 (Ohio App. 1996); *State v. Keith*, 79 Ohio St.3d 514 (1997). In the trial court, Keith filed a motion for state

postconviction relief, asserting that his trial had been fundamentally unfair and that his counsel had been ineffective. The court denied that motion, and the Ohio Court of Appeals affirmed. *State v. Keith*, No. 3-98-05, 1998 WL 487044 (Ohio App. 1998). The Ohio Supreme Court denied leave to appeal. *State v. Keith*, 84 Ohio St.3d 1447 (1998). Keith then filed his first federal habeas petition, which the district court dismissed in 2001. This court affirmed. *Keith v. Mitchell*, 455 F.3d 662 (6th Cir. 2006).

In April 2004, Keith discovered through a public-records request that the handwritten notes from Warren's hospital stay had been faxed to Captain Corwin rather than discarded. Warren's notes were scattered across the page in difficult-to-read script, reflecting his difficulty in writing them. On the last page, the words "Capt. Stanley," "Kevin," "Damon," and "Bucyrus Police" appeared in neat handwriting that seemed clearly different from Warren's. With this evidence, Keith filed a second petition for postconviction relief in the trial court, on *Brady* grounds. That petition was "successive" under Ohio law, meaning Keith could not succeed unless he established by clear and convincing evidence that, but for the constitutional errors at trial, no reasonable juror would have convicted him. Ohio Rev. Code. § 2953.23(A)(1)(b). The trial court held Keith could not meet that burden, and the Ohio Court of Appeals affirmed. *State v. Keith*, 176 Ohio App.3d 260 (2008).

In 2007, Keith discovered that the prosecution had withheld a second set of materials: the State Pharmacy Board's file on the investigation of Bruce and Rodney Melton. The file revealed that the Meltons had "spread the word that anybody that snitches on them would be killed"; that Rodney wore a type of mask similar to the one described by Warren and Quanita; and that Rodney owned a yellow Impala and had previously had a license plate which included "043." It also showed that Rodney Melton had bragged to a coconspirator that he had been paid $15,000 to "cripple" or "off" Rudel Chatman. At around the same time, Keith's counsel also discovered that Warren's hospital had never employed a nurse named "Amy Gimmets," suggesting that Captain Stanley had misspoken or lied when he testified about speaking with Warren's nurses.

Keith again asked the state court for a new trial, this time arguing that the Pharmacy Board materials should have been disclosed under *Brady* and that Captain Stanley had lied on the stand. The trial court denied relief, the Ohio Court of Appeals affirmed, and the Ohio Supreme Court denied leave to appeal. *State v. Keith*, 2008 WL 5053538 (Ohio App. 2008); *State v. Keith*, 123 Ohio St.3d 1508 (2009). Keith then filed a second habeas petition in federal court asserting substantially the same claims, but this court denied Keith permission to pursue a successive petition. *Keith v. Bobby*, 551 F.3d 555 (6th Cir. 2009).

Meanwhile, Keith's counsel received the police department's radio logs for the relevant time period, which showed no contact between the hospital and the police department on the morning John Foor said he had spoken with the police. Keith then filed a petition for clemency with the Governor. On September 2, 2010, then-Governor Strickland commuted Keith's death sentence to life without parole.

Keith's legal team thereafter repeatedly requested more information from the Ohio Bureau of Criminal Investigations regarding Michele Yezzo's work as an expert, but each time the Bureau refused to provide that information. In 2014, Keith filed a third federal habeas petition based on a change in law not relevant here; this court denied Keith permission to proceed with that petition as well. *In re Keith*, No. 14-3290 (6th Cir. Dec. 8, 2014).

Little changed in Keith's case over the following two years. In December 2016, however, the Ohio Supreme Court held that criminal defendants have a "clear legal right" to the public records in their own cases. *State ex. Rel. Caster v. City of Columbus*, 151 Ohio St. 3d 425, 439 (2016). Keith promptly filed another request for the police's casefiles, which he received some months later. Those files included Keith's pretrial subpoena for the police's call records. On the subpoena, someone had made the notation "Ignore for now." Keith also received Michele Yezzo's personnel file, which contained years of warnings and reprimands. Specifically, Yezzo's file showed that Yezzo's supervisors, colleagues, and even her union representatives had repeatedly expressed serious concerns about the reliability of her work. One report concluded that Yezzo would "stretch the truth to satisfy a department."

Keith again filed a motion for postconviction relief in the trial court.  Along with his motion, Keith submitted a report from a forensic analyst who had reevaluated Yezzo's work and concluded that the snow impressions were not consistent with the Oldsmobile.  The state courts again denied relief at every level.  *State v. Keith*, No. 3-17-01, 2017 WL 2729625 (Ohio App., June 26, 2017); *State v. Keith*, 151 Ohio St.3d 1456 (2017).

Keith then filed this habeas petition in federal district court—his fourth—alleging that the prosecution's failure to disclose the Yezzo file violated *Brady*, and that the "ignore for now" subpoena showed the police had deliberately suppressed its call records.  Keith attached a report from another expert who disagreed with Yezzo's conclusion; he also submitted an affidavit from Yolanda Price, an acquaintance who said she remembered seeing Kevin at his aunt Gracie's house between 8 and 9 p.m. on the day of the shooting.

This court granted Keith authorization to proceed with his successive habeas petition.  *In re Keith*, 2018 WL 8807240 (6th Cir. 2018).  On remand, the district court denied Keith's petition, holding that Keith could not meet the high standard applicable to successive habeas petitions.  *See* 28 U.S.C. § 2244(b)(2)(B).  This appeal followed.

## II.

We review the district court's denial of habeas relief de novo.  *Theriot v. Vashaw*, 982 F.3d 999, 1003 (6th Cir. 2020).

## A.

The Antiterrorism and Effective Death Penalty Act bars federal courts from considering the merits of a "second or successive" habeas petition unless:

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B).  The question here is whether Keith can satisfy these requirements.

1.

Everyone agrees that the impeachment information in Yezzo's personnel file is the "factual predicate" for Keith's latest *Brady* claim. 28 U.S.C. § 2244(b)(2)(B)(i). And we have no doubt as to Keith's diligence in discovering that information. Keith's counsel filed a motion for pretrial disclosure of all *Brady* material on February 28, 1994—less than two weeks after Keith's arrest. The prosecution thereafter turned over some documents and assured Keith's counsel that it had complied with its *Brady* obligations. After receiving that assurance, Keith was not required to "scavenge for hints of undisclosed *Brady* material." *Banks v. Dretke*, 520 U.S. 668, 695 (2004). And Keith's attorneys filed multiple requests for further information about Yezzo's expert investigation after his conviction. Thus, Keith has met the diligence requirement. *See also In re Keith*, 2018 WL 8807240 at *6.

2.

The statute's second requirement requires Keith to establish by clear and convincing evidence that, but for the constitutional errors at trial, no reasonable juror would have convicted him. 28 U.S.C. § 2244(b)(2)(B)(ii). In our application of that standard, we must consider the "evidence as a whole," meaning "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (cleaned up).

As an initial matter, the Warden argues that Keith must affirmatively prove his factual innocence—meaning, in other words, that he did not in fact commit the subject crime. The Supreme Court has indeed described the relevant provision as requiring a prisoner to "establish his innocence by clear and convincing evidence," *Calderon v. Thompson*, 523 U.S. 538, 558 (1998)—or, more recently, as requiring "a credible claim of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 398 (2013). But the Court has also repeatedly made clear—including in *Calderon* and *McQuiggin*—that a defendant is "actually innocent" for purposes of habeas review when, considering the evidence as a whole, "no reasonable juror would have convicted him." *Calderon*, 523 U.S. at 540; *House*, 547 U.S. at 526; *McQuiggin*, 569 U.S. at 385, 393-94. That is also what the statute itself expressly provides. 28 U.S.C. § 2244(b)(2)(B)(ii).

Yet the district court, like the Warden, appears to have treated the "actual innocence" standard as interchangeable with "factual innocence." They are not. To establish that no reasonable juror would have convicted him, Keith must show that "no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that . . . any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 537-38. Proof beyond a reasonable doubt requires jurors to "reach a subjective state of near certitude of the guilt of the accused," *Jackson v. Virginia*, 443 U.S. 307, 315 (1979); it is proof "so convincing that you would not hesitate to rely and act on it in making the most important decisions in your own [life]." *Sixth Circuit Pattern Jury Instructions*, § 1.03(5). A defendant who can dismantle the government's case against him could therefore overcome the procedural bar of § 2244(b)(2)(B)(ii)—by clearly and convincingly removing that "certitude"—even if he cannot show that he is, in fact, innocent. *House*, 547 U.S. at 553-54 ("conclusive exoneration" not required to show "actual innocence"); *see also Rivas v. Fisher*, 687 F.2d 514, 518 (2d. Cir. 2012).

i.

To determine whether Keith can meet this standard, we begin with the "facts underlying" Keith's claim, namely, the state's suppression of Yezzo's personnel file. 28 U.S.C. § 2244(b)(2)(B)(ii). Yezzo's file shows that, over the course of decades, supervisors and coworkers concluded that Yezzo was mentally unstable and would distort the truth to please police departments. As we held in another case involving Yezzo, that information would have been "crucial impeachment evidence." *O'Donnell v. Yezzo*, 2022 WL 130885 at *1 (6th Cir. 2022). A reasonable jury today would very likely discount Yezzo's testimony entirely.

Yezzo's only role at trial, however, was to establish the presence of the Oldsmobile at the scene. And other evidence separately indicated that the attacker had used the Oldsmobile to escape. Specifically, Nancy Smathers testified that she saw a car with broken dome and license plate lights—and neither light worked on the Oldsmobile. She also said she saw someone rock the car to release it from the snow—and the Oldsmobile had smudges on the A-pillar consistent with someone rocking it. Moreover, the prosecution established that someone had changed the

tires on the Oldsmobile shortly after the murders—even though the car already had new tires. Thus, even without Yezzo, some evidence at trial connected this car to the crime.

More importantly, nothing from Yezzo's file affects the core evidence against Keith—namely, Warren's testimony. Warren had every reason to testify truthfully about who had shot him four times. At trial, Warren insisted that Marichell had repeatedly referred to her attacker as "Kevin," and that she said the attacker had recently been involved in a "large drug bust" (as Keith had been). Warren also said that he had reported the name "Kevin" to his doctors and nurses. He further testified that his attacker had been a heavyset black man, and he recognized Keith in the courtroom. And other evidence supported Warren's account: Smathers saw the shooter flee the building and confirmed Warren's physical description of him; Nurse Foor testified that Warren had identified "Kevin" as his attacker; and Captain Stanley testified he heard the name "Kevin" from another nurse as well. Thus, with or without Yezzo, the jury had ample reason to believe Warren's testimony.

ii.

To prevail in spite of Warren's testimony, Keith would need to establish by clear and convincing evidence that every reasonable juror would doubt the accuracy or truthfulness of that testimony. Keith tries to make that showing by pointing to evidence that police improperly suggested the name "Kevin" to Warren. But that argument overlooks an important part of Warren's testimony. Warren said that Marichell told him the intruder had recently been involved in a "large drug bust." At the time of the murders, that was true only for Keith, who had been arrested just a month before. And that was not true for the Meltons, Keith's favored suspects, who were not indicted until two months later, in April.

To be sure, the police grossly mismanaged its records in this case by failing to record several of its interactions with Warren and his nurses. The police also should have complied with Keith's pre-trial subpoena for the relevant call records. *Brady*, 373 U.S. at 88. But police misconduct does not explain why John Foor—a nurse with no apparent connection to this case—would lie under oath about what Warren had said to him shortly after his surgery. True, Foor incorrectly testified that Warren himself had written down the name "Kevin" and that Foor had

discarded the note; but those mistakes do not show that Foor was a liar. To the contrary, Warren's trial testimony provided a plausible explanation for the discrepancy in handwriting:

Q: Did you write any letters to anyone or any notes?

A: Yes, sir, I did.

Q: What did you do—who did you write to?

A: At first I tried to—I couldn't talk and my hands were strapped down. So I tried to do sign language and none of the nurses knew it. When my father got there he translated my sign language to the nurses then they wrote it down on paper.

Thus, Keith cannot show that Foor committed perjury at trial.

Keith faces similar problems with respect to the alleged call from nurse Amy. Again, the police made mistakes: Captain Stanley recalled Amy's last name incorrectly at trial, and a purported "transcript" of the call is incomplete. But Warren himself testified at trial that he told several of his nurses his attacker was named "Kevin." And though Keith's arguments about the suggestibility of witnesses could explain how Warren came to identify his attacker as "Kevin," they do not explain why Warren would lie about his interactions with hospital personnel. Keith has not shown, clearly and convincingly, that every reasonable juror would doubt Warren's testimony.

Keith also points to other evidence that has become available since his conviction. Specifically, the Pharmacy Board files show that Rodney Melton generally wore a mask covering only the bottom half of his face—like the mask that Warren testified the killer had worn. Those same files showed (amazingly enough) that Melton had owned a light-colored car with "043" in the license plate, and that he had been offered money to "off" Rudel Chatman. That evidence certainly favors Keith, especially when read together with Quanita's identification of the killer as "Bruce." As the jury learned at trial, however, Bruce Melton did not fit the description of the shooter. Everyone agrees the killer was a large, "fat" man, and Bruce Melton was a short man of average weight. Quanita's identification of "Bruce" therefore does not plausibly point to Bruce Melton. And Quanita's mother testified that her daughter had confused Kevin Keith with "Bruce" before.

We thus agree with our concurring colleague—considering only the evidence at trial and the new evidence relied upon by Keith post-trial—that Keith cannot show that every reasonable juror would have reasonable doubt about his guilt. Considering that evidence alone, rather, we think that only some—and perhaps most—jurors likely would find reasonable doubt.

The Supreme Court has told us, however, that we must consider the "evidence as a whole," meaning "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (cleaned up). Moreover, by relying extensively on non-*Brady* evidence—including police records—Keith has waived any objection to the use of incriminating police records in our evaluation of "all the evidence."

And the full record here contains significant additional evidence of Keith's guilt. Specifically, the police file shows that Quanita's brother Quinton did identify the attacker as "Kevin." It also shows that the Keiths had been threatening the Chatman family for months before the shooting. Indeed, an interview with a different confidential informant—submitted to the court by Keith—suggests that it had been Keith himself who offered Rodney Melton money to "off Rudel":

> Q: Or you don't know anything [about the shootings]?
>
> A: Bruce, Bruce said, he goes "I don't know, the guy coulda snapped and done it," because of cocaine. But, you know, if the guy didn't do it himself, I know Rodney Melton, I heard, was offered $5,000 to off Rudel.
>
> Q: Who'd you hear that from?
>
> A: Bruce. So, but I don't think Rodney did it; I don't think.
>
> Q: Who offered him money?
>
> A: I, I guess one of the Keiths or Kevin, himself. I don't know.

That account would be consistent with Gene Keith Sr.'s earlier threat that a "contract was already out" on Rudel Chatman. Thus, even the records that inculpate the Meltons do not clearly exculpate Keith.

The police files also clarify Keith's motive for committing the shooting. Keith might have faced comparatively minor charges from the drug bust, but Chatman took down a major

drug network run by Keith's family and friends. Meanwhile, the Pharmacy Board files show that Chatman was only one of many informants against the Meltons—who, again, were not indicted until months after the shooting. The full record therefore refutes Keith's assertion that only the Meltons had a plausible motive for these murders.

Some of most damning evidence against Keith, finally, came from Marichell's neighbors. Kathy Gale saw Keith scope out Marichell's apartment on the morning of the shooting; and she saw him waiting by the parking lot just minutes before the shooting. Her son then watched from less than six feet away as Keith shot at Warren as he fled, striking him in the rear and knocking him down—which in fact occurred just as Gale described it to the police.

Taken together, the evidence described above—Warren's testimony, Gale's account, the Oldsmobile evidence, and Keith's motive to retaliate against Rudel Chatman—show that jurors faced with "the evidence as a whole" could reasonably convict Keith again today. Keith has not shown by clear and convincing evidence that "no reasonable factfinder" could find him guilty of triple homicide. 28 U.S.C. § 2244(b)(2)(B). We therefore may not consider the merits of his petition. *Id.*

\*      \*      \*

The district court's judgment is affirmed.

_____

**CONCURRENCE**

_____

HELENE N. WHITE, Circuit Judge, concurring in part.  I concur in the judgment because I agree that Petitioner Kevin Keith fails to clear the exceedingly high bar of 28 U.S.C. §§ 2244(b)(2)(B)(ii).  There is no question that Keith would have had a better chance of acquittal had the *Brady* material been known to his defense team.  But that is not the test.  Rather, Keith must show that the withheld evidence, "if proven and viewed in light of the evidence as a whole," would establish "by clear and convincing evidence" that, had the evidence been disclosed, "no reasonable factfinder would have found [him] guilty of the underlying offense." 28 U.S.C. §§ 2244(b)(2)(B)(ii); *see also House v. Bell*, 547 U.S. 518, 538 (2006).  I cannot say that it is more likely than not that *no* reasonable juror who completely discounted Yezzo's expert testimony, and had the benefit of the police call logs and the information in the Ohio Pharmacy Board's files incriminating the Melton brothers,[1] would have found Keith guilty beyond a reasonable doubt, considering Richard Warren's identification of Keith as his assailant and Nancy Smathers's testimony matching Keith's girlfriend's grandfather's car to the getaway vehicle.  *House*, 547 U.S. at 538.

However, I base my conclusion solely on the evidence at trial and the new evidence produced by Keith post-trial.  I do not factor into my decision the additional information in the 1994 police reports because the State itself chose not to present it at trial, its reliability has never been tested, the government does not discuss the information in this appeal, and I do not agree that by relying on police records to buttress his arguments, "Keith has waived any objection to the use of incriminating police records in our evaluation of 'all the evidence.'"[2]

---

[1]I also acknowledge that although Bruce Melton does not share Keith's physical characteristics, apparently Rodney Melton—at six feet two inches tall and 214 pounds—was closer in size and stature to the shooter, described by Warren as "approximately six to six/two, 250, 275."  R. 20-26, PID 8027; R. 21-1, PID 10047.  Both Melton brothers testified before the jury at trial.

[2]Specifically, I would not rely on the following information, which was known to the State in 1994, yet not presented to the jury:  (1) Keith's alleged shakedown and robbery of Chatman; (2) Shannon Bostic and her mother's encounter with Keith's relative, during which Keith's relative allegedly threatened Chatman; (3) Keith's uncle's threat that the Keith family was going to "whack" Chatman's family in retribution; (4) Damon Chatman's statement to the police that the Keiths were going to "Kill every Chatman alive"; (5) Kathy Gale's statements about her and her son's identification of Keith as the shooter on the day of the murder.